## G. RICORDI & CO., Inc., v. COLUMBIA GRAPHOPHONE CO.

(District Court, S. D. New York. July 20, 1920.)

**Copyrights ⬤�longdash⟩66—Reproducing records "manufactured" in United States.**

Disc records for reproducing a song copyrighted by complainant, sold by defendant in Canada, *held* subject to payment of a royalty under copyright Act, § 1e (Comp. St. § 9517), as "manufactured" in the United States, on evidence showing that in the process of manufacturing such records there are nine steps, eight of which, resulting in the completion of the copper stamper, from which the wax records are made, were taken in the United States, and the stamper then taken to Canada, where the actual playing discs were made, which comprised the ninth step of the process.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Manufacture.]

In Equity. Suit by G. Ricordi & Co., Incorporated, against the Columbia Graphophone Company. On motion to confirm report of special master. Motion granted.

See, also, 256 Fed. 699; 258 Fed. 72.

The following is the report of Thomas B. Felder, Special Master:

On the ——— day of January, 1920, Hon. Martin T. Manton, Circuit Juage, at a term of the United States District Court for the Southern District of New York, entered an order from which I quote:

"Further ordered, adjudged and decreed that the Columbia Graphophone Company account to the plaintiff for all disc records serving to mechanically reproduce the musical composition 'Dear Old Pal of Mine' manufactured by the defendant, and pay to the plaintiff two cents for every such disc record so manufactured by the defendant, and it is

"Further ordered, adjudged and decreed that this case is hereby referred to Thomas B. Felder, Esq., a master of this court, who is hereby appointed to take and state an account of all such disc records so manufactured under the plaintiff's United States copyright by the defendant, and to assess such damages and report the same to this court with all convenient speed."

By virtue of the authority conferred by said order, the undersigned, Thomas B. Felder, acting as Master, has had numerous hearings where evidence, both parol and documentary, was taken. arguments made, and briefs by counsel submitted. After carefully considering the evidence, the arguments and briefs of counsel, the undersigned begs to submit the following report:

The defendant, Columbia Graphophone Company, filed with the undersigned as master of this court, a statement showing that up to February 29, 1920, it had manufactured, under plaintiff's United States copyrights, 76,688 baritone solo and 13,755 violin solo disc records of the musical composition "Dear Old Pal of Mine." The plaintiff filed objections to this account stated on the ground that the defendant failed to include therein other disc records which plaintiff claimed were manufactured under its copyrights and therefore subject to the royalty. It was thereupon stipulated between the parties that in addition to the above there were 4,763 commercial records of the baritone solo and 1,920 of the violin solo which defendant claimed were made in Canada, the contention of the defendant being that there was no liability to plaintiff on account of these disc records. The issue therefore presented for decision is as to the liability of defendant to the plaintiff for the commercial disc records which were claimed to have been made in Canada.

In order to reach a correct conclusion as to the real issue involved, it is not only necessary to carefully examine and analyze the Copyright Act of March

4, 1909 (Comp. St. §§ 9517–9524, 9530–9584), but the evidence submitted as well. The following is the pertinent portion of section 1, subdivision (e) of the Copyright Act (Comp. Stat. § 9517):

"That whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of two cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the twentieth day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalty shall be due on the parts manufactured during any months upon the twentieth of the next succeeding month. The payment of the royalty provided by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit; and provided further, that it shall be the duty of the copyright owner, if he use the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the Copyright Office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright."

The following is section 25, subdivision (e), of the Copyright Act (Comp. Stat. § 9546), which provides for the relief and damages in case of infringement in the manufacture of these commercial records:

"(e) Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instrument serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages, a royalty as provided in section 1, subsection (e), of this act: Provided also, that whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this act, he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice; and in case of his failure so to do the court may, in its discretion, in addition to sums hereinabove mentioned, award to complainant a further sum, not to exceed three times the amount provided by section 1, subsection (e), by way of damages, and not as a penalty, and also a temporary injunction until the full award is paid."

I construe the above-quoted sections of the Copyright Act, in connection with the entire act, to mean the royalty provided for therein becomes payable by the month to the proprietor of the copyright upon the "manufacture" of the commercial records; hence it is all-important to decide the meaning of the word "manufacture" as used in the Copyright Act. If the records were "manufactured" in the United States by the defendant, its liability to pay the plaintiff two cents for each of such records is obvious.

Webster defines "manufacture" as follows:

"1. The operation of making wares or any products by hand or by machinery or by other agencies.

"2. Anything made from raw materials by the hand, by machinery, or by art, as cloths, iron utensils, shoes, machinery, saddlery.

"3. To make (wares or other products) by hand, by machinery, or by other agencies; as to manufacture cloth, nails, glass, etc.

"4. To work, as raw or partly wrought materials into suitable forms for use; as to manufacture wool, cotton, silk or iron."

The premises considered, it now becomes pertinent and material to briefly advert to evidence which is undisputed as to what was done "step by step" by the defendant in producing the 4,763 baritone and 1,920 violin solo disc records, which were sold in Canada, and which it is claimed, by reason of the fact that there are no copyright laws in Canada, were not embraced in the accounting. It appears that the process of manufacture of a commercial phonograph record involves nine distinct, separate and progressive steps which may be briefly described as follows:

1. The song which is to be sold in the form of a phonograph disc record is first sung by an artist, the sound waves thus produced by the rendition of the song are collected by device and recorded on a revolving wax-like tablet known as a blank. This blank revolves on a turntable of approximately 80 revolutions per minute, and as the song is sung, the sound box attached to a very fine sapphire jewel known as a recording stylus, is let down in the surface of the wax tablet and cuts into the same and the vibrations of the sound are engraved on this tablet in the form of a volute spiral. The wax record thus made is called a wax master record.

2. The wax master record is then prepared for electro plating by coating it with graphite, a metallic conducting surface.

3. The wax master record coated with graphite is placed in an electro plating bath and covered with a coating of copper. The copper shell, reproducing the recording on the wax master, is then stripped from the wax master. This is known as a copper master record.

4. The copper master record is then cleaned, silvered and waxed.

5. The copper master record thus coated is placed in an electro bath and a shell of copper is deposited thereon. This shell of copper is then stripped and represents a record that is in all respects the same as the original wax engraving. This is called a mother record.

6. The mother record is then silvered and prepared for an electro plating bath.

7. The mother record, coated with silver, is placed in an electro plating bath and a copper shell deposited thereon which when stripped is known as the working matrix, or a stamping matrix.

8. The copper stamper is then trimmed to size, a hole punched in the center, the surface prepared and then nickeled in order to prevent oxidation.

9. The nickel stamper is then placed in a press, a thermo-plastic material, consisting of clay, shellac, lamp black and flock (ground cloth), is placed on a steam table, the copper stamper is sweated into a die, and that is also placed on the steam table. The plastic material is then brought together with the stamper under great pressure and flows into the lines of the record, after which it is chilled and separated.

It appears that eight of the nine steps in the process of "manufacture" of the commercial records were taken by the defendant in the United States, and that the ninth step, or the step which resulted, speaking in the common vernacular, in putting the "finishing touches" upon the disc, was taken by the defendant at its factory in Toronto, Canada, where the various parts, such as wax blanks, wax masters, wax matrices, mother matrices, stamping shells and backed-up stampers, were shipped after they had been manufactured, as above stated, within the United States. In other words, the "manufacture," as I see it, commenced when the song was sung by the artist and recorded upon the wax master record, and every step taken thereafter, up to and including the one described in paragraph "8," was taken within the territorial limits of the United States.

In reaching a conclusion in respect of the issue presented, I am frank to confess that in view of the fact that there are practically no judicial "signboards" hung along the pathway that I have been forced to travel to "point the way," I have been much vexed in reaching a conclusion. The only judicial decision upon the subject is one rendered by Mr. Justice Hotchkiss of the Supreme Court in the case of Leo Feist, Inc., v. Columbia Graphophone Co. (no opinion filed). The examination of the record in this case discloses

that the defendant had obtained three licenses for the manufacture and sale of phonograph records of musical compositions. These license agreements referred to the Copyright Act, and by incorporation, the act became a part of the agreements. The defendant recorded the songs of these three compositions upon wax master records in the United States and shipped the copper stampers to Canada, where it proceeded to stamp out commercial records from these copper stampers in Canada. It was urged in that case that the Copyright Law had no extraterritorial jurisdiction and could not affect the sale of the records which were manufactured outside of the United States. In disposing of the issue presented in that case, the justice said: "I think the records must be deemed to have been manufactured in the United States. To hold otherwise would permit the defendant to work what would practically amount to a fraud upon both plaintiff's statutory and contract rights."

While, of course, this decision is not conclusive, it is nevertheless, in my judgment, entitled to consideration and weight. In this connection I might say that I have read and considered very carefully the elaborate, comprehensive and able brief filed by defendant's counsel. I have also examined very carefully the authorities therein cited. From this examination, I am unable to reach the conclusion that these authorities are either elucidating or controlling when applied to the facts of this case in as much as they all show that no part of the transaction involved in them took place within the territorial limits of the United States. In the case of Dowagiac Mfg. Co. v. Minnesota Plough Co., 235 U. S. 641, on page 650, 35 Sup. Ct. 221, 225 (59 L. Ed. 398), being one of the cases cited by defendant's counsel, the court says: "Some of the drills, about 261, sold by the defendants were sold in Canada, no part of the transaction occurring within the United States."

The articles involved in this case, while made in the United States, were not made by the defendant. In this case the court mentioned the case of Manufacturing Co. v. Cowing, 105 U. S. 253, 26 L. Ed. 987, in which damages were awarded for articles made in the United States and sold abroad. As to this transaction, the court holds: "The case of Manufacturing Co. v. Cowing, 105 U. S. 253, is cited as holding otherwise, but is not in point. There the defendant made the infringing articles in the United States. Here while they were made in the United States, they were not made by the defendant, the latter's infringement consisting only of selling the drills after they passed out of the maker's hands. The place of sale is therefore of controlling importance here."

All of the other cases cited, and which I do not deem it necessary to discuss in detail, seem to throw little, if any, light upon the issue involved for the reason I have stated heretofore, namely, that no part of the transactions, in any of these cases, took place within the territorial limits of the United States. In the light of the facts above recited and of the Copyright Law applied thereto, the conclusion becomes inevitable that the records involved must be deemed to have been manufactured in the United States, constat, defendant is liable to the plaintiff for the amount of royalties shown by the statements filed with the undersigned as master of this court, and in accordance with this finding, I respectfully submit as master, the following report:

Plaintiff is entitled to recover from the defendant on the accounting as follows:

| | | | |
|---|---|---|---|
| 78,688 records at $.02 | | | $1,573.76 |
| 13,755 records at .02 | | | 275.10 |
| 4,763 records at .02 | | | 95.26 |
| 1,920 records at .02 | | | 38.40 |
| | | | $1,982.52 |

All of which is respectfully submitted. The evidence taken is hereto attached and made a part hereof.

Nathan Burkan and Francis Gilbert, both of New York City, for plaintiff.

W. L. Goldsborough, of New York City (Emory R. Buckner, A. E. Garmaize, and Maxwell Steinhardt, all of New York City, of counsel), for defendant.

MANTON, Circuit Judge. The gist of this case is to determine what is meant by "manufacture." The various steps taken to produce the product which was shipped to Canada, were all essential to the manufacture of the records, which were finally finished and sold in Canada. I think, within the intent and meaning of the copyright statute, the defendant manufactured the records, which are sold in Canada, in the United States. I agree with the result reached by the special master and will confirm his findings.

Motion to confirm granted.